UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
DEVAYANI KHANNA,

                      Plaintiff,

            v.

MUFG UNION BANK, N.A. and ROBERT
NOLEN, in his individual and professional
capacities,

                      Defendants.
------------------------------------------------------------ X

No.: 18-cv-03031 (ALC)(HBP)

**SECOND AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiff Devayani Khanna ("Plaintiff" or "Ms. Khanna"), by and through her counsel, Wigdor LLP, hereby states and alleges as follows:

**PRELIMINARY STATEMENT**

1. In June 2016, Ms. Khanna joined Defendant MUFG Union Bank, N.A., ("Union Bank" or the "Bank") as a Director-level Program Manager after working 23 years at J.P. Morgan Chase, where she established a distinguished reputation for superior project management and program delivery.

2. Union Bank enticed Ms. Khanna to make the move from J.P. Morgan Chase by offering her a significant signing bonus and telling her that she would be positioned for increased responsibilities and compensation at the Bank.

3. As an Asian woman of Indian descent, Ms. Khanna also believed that joining Union Bank was a positive move given the purportedly diverse workplace and the touted culture of diversity and inclusion at the Bank.

4. Unfortunately, Ms. Khanna learned that the culture of diversity and inclusion did not extend to all parts of the Bank.

5. Particularly, in mid-April 2017, after successfully working at Union Bank for almost a year under two women of color, Ms. Khanna was reassigned to work under Defendant Robert Nolen ("Mr. Nolen"), a White male who headed the newly-formed Financial Crimes Project Management Office ("FCPMO") out of the Bank's office in North Carolina.

6. Almost immediately, Ms. Khanna noticed that Mr. Nolen treated her differently than the other all White male Program Managers who reported to him, and Ms. Khanna's responsibilities and support staff were quickly diminished and transferred to yet another White male Program Manager who Mr. Nolen hired within a couple months of Ms. Khanna transferring to FCPMO.

7. Mr. Nolen made it known, through his conduct, that he did not like Ms. Khanna, a minority woman, as he was often short and abrupt in his interactions with her, kept her isolated from the rest of the FCPMO team, unfairly criticized her work, negatively influenced her annual review and bonus and questioned Ms. Khanna after only a couple of months in FCPMO whether she would be giving notice to leave the Bank.

8. Mr. Nolen's attempts to persuade Ms. Khanna to voluntarily leave were ineffective given that Ms. Khanna was a committed employee who was willing to work tirelessly to successfully perform her job responsibilities, and joined Union Bank with the intention to work there for several years until she retired.

9. Because Mr. Nolen's efforts to get Ms. Khanna to leave on her own were unsuccessful, Mr. Nolen resorted to issuing Ms. Khanna a pretextual Performance Improvement Plan and then terminated her on the basis that she had "not improved enough."

10. Mr. Nolen's contrived performance deficiencies stands in stark contrast to feedback that Ms. Khanna received from other executives at the Bank who praised Ms. Khanna

for "doing a wonderful job" and being the "most organized and prepared" Program Manager in FCPMO.

11. As further evidence of Mr. Nolen's discriminatory motives, Ms. Khanna's replacement, a White male, started **the very next day** after Ms. Khanna was terminated — signifying that Mr. Nolen intended to terminate Ms. Khanna no matter how well she performed.

12. Mr. Nolen's nineteenth century-preference to only hire and work directly with White males contravenes federal, state and city anti-discrimination laws, and should not be tolerated.

## NATURE OF THE CLAIMS

13. This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress unlawful employment practices committed against Ms. Khanna, including Mr. Nolen's discriminatory treatment and termination of Ms. Khanna due to her gender and race in violation of 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq*. ("NYCHRL"), Title VII, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").

## ADMINISTRATIVE PROCEDURES

14. Plaintiff filed a charge of discrimination and retaliation arising out of the facts described herein with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII. The EEOC issued Ms. Khanna's notice of right to sue, and she therefore adds claims against Union Bank for violations of Title VII.

15. Following the commencement of this action, a copy of this Complaint will be served on both the New York City Commission on Human Rights and the Office of the

Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

16. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

17. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.

18. This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

19. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

20. Plaintiff Devayani Khanna is a former employee of MUFG Union Bank, N.A. in New York City.  Ms. Khanna is an Asian-American female and a person of color within the meaning of Section 1981.  She is a citizen of the State of New Jersey.  At all relevant times, Ms. Khanna met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

21. Defendant MUFG Union Bank, N.A. is a national bank with its main office chartered in California and its corporate headquarters located at 1251 Avenue of the Americas, New York, NY 10020.  Defendant MUFG Union Bank, N.A. is a subsidiary of MUFG Americas Holding Corporation and part of Mitsubishi UFJ Financial Group, Inc., the fourth-largest bank in the world with approximately $2.6 trillion in assets as of December 31, 2016.  At all relevant

times, Defendant MUFG Union Bank, N.A. met the definition of "employer" and/or "covered employer" under all relevant statutes.

22. Defendant Robert Nolen is a White male, who, upon information and belief, resides in the State of North Carolina. Mr. Nolen is Director of Global Financial Crimes Project Management Office at Union Bank and directly supervised Ms. Khanna from, in and around, April 2017 until her termination, on or about, October 16, 2017, and directly had authority over the terms and conditions of Ms. Khanna's employment. In this position, Mr. Nolen was a direct participant in the discriminatory policies and practices to which Ms. Khanna was subjected. At all relevant times, Mr. Nolen met the definition of "employer" and/or "covered employer" under all relevant statutes.

**FACTUAL ALLEGATIONS**

**Background**

23. Before joining Union Bank, Ms. Khanna worked for over 23 years at J.P. Morgan Chase, where she established a distinguished reputation for superior project management and program delivery in multiple areas of the bank.

24. At J.P. Morgan, Ms. Khanna was responsible for overseeing projects with annual budgets of up to $50 million, and she received top performance ratings and increases in compensation during her employment.

25. On May 4, 2016, Ms. Khanna accepted an offer of employment from Union Bank to be a Program Manager at the Director-level within Union Bank's Technology and Operations Group, also known as Integrated Services for the Americas ("ISA").

26. During the interview process, Ms. Khanna was told that she was being hired to manage a portfolio of projects and would supervise approximately six to eight project managers.

27. To entice Ms. Khanna to join Union Bank, the Bank offered her a $25,000 signing bonus and told Ms. Khanna that she would be positioned to increase her role and compensation at the Bank.

28. As an Asian woman of Indian descent, and a person of color within the meaning of Section 1981, Ms. Khanna appreciated the Bank's claim that it "value[s] workplace diversity" and is "committed to leveraging the diverse backgrounds, perspectives and experiences of our workforce to create opportunities for our people and our business."

29. On June 20, 2016, Ms. Khanna began working at Union Bank and was assigned to manage the implementation of an approximately $40-50 million anti-money laundering ("AML") system called Clean Slate, which consisted of three separate projects: (i) Vendor Platform Selection ("Vendor Selection Project"); (ii) Continuous Monitoring Dashboard Phase 2 ("Continuous Monitoring"); and (iii) Data Tracking ("Data Tracking").

30. The Clean Slate system had previously been placed on hold in April 2016, before Ms. Khanna's hiring, even though the Clean Slate system was critical for the Bank's AML regulatory compliance obligations, and the Bank had made commitments to the Federal Reserve Board that it would move the project forward.

31. Ms. Khanna initially reported to Liz Torres, an ISA Managing Director. Ms. Khanna was assigned one junior project manager and one Vice President ("VP") Project Manager.

32. In November 2016, Ms. Torres told Ms. Khanna to report to Yih-Chun Lin, a Risk and Compliance Portfolio Manager.

33. In early January 2017, Ms. Khanna's VP Project Manager left the Bank and was replaced with a less experienced, external contract project manager.

34. Despite not being fully staffed, Ms. Khanna worked diligently on the Clean Slate system projects and successfully moved the projects forward.

**Ms. Khanna is Transferred to Work Under Mr. Nolen**

35. In mid-April 2017, Ms. Khanna was reassigned to work under Mr. Nolen, a White male who headed the newly-formed Financial Crimes Project Management Office ("FCPMO") out of the Bank's office in Charlotte, North Carolina. Scott Bavis, a White male Director-level Program Manager with similar responsibilities as Ms. Khanna, was also transferred to work under Mr. Nolen.

36. In connection with the transfer, Ms. Lin expressed her concern to Ms. Khanna that Ms. Khanna may not be given a comparable management role in FCPMO under Mr. Nolen, and suggested for Ms. Khanna to follow-up with him to ensure that she does.

37. True to Ms. Lin's words, over the next few months, Mr. Nolen hired two additional Director-level Program Managers, both White males, and Mr. Nolen diminished Ms. Khanna's responsibilities and isolated her from the rest of the FCPMO team.

38. First, shortly after Ms. Khanna was transferred to FCPMO, Mr. Nolen hired Kevin Vedder ("Mr. Vedder"), a White male, as a Director-level Program Manager in FCPMO with similar responsibilities as Ms. Khanna.

39. Second, within a couple months of Ms. Khanna being transferred to FCPMO, Mr. Nolen also hired Frank Donatelli ("Mr. Donatelli"), a White male, who also held a Director-level Program Manager title with similar responsibilities as Ms. Khanna.

40. Upon hiring Mr. Donatelli, Mr. Nolen assigned to him Ms. Khanna's Continuous Monitoring and Data Tracking projects – leaving Ms. Khanna with only one of her three projects, the Vendor Selection Project.

41. Mr. Nolen also reassigned Ms. Khanna's recently-hired contract project manager to Mr. Donatelli.

42. When Ms. Khanna expressed to Mr. Nolen her concern about the decrease in her responsibilities, Mr. Nolen promised Ms. Khanna that she would be assigned to additional projects.

43. However, Mr. Nolen's words rang hollow, as he did not assign her to any additional projects.

44. Neither Mr. Bavis nor Mr. Vedder had any assignments taken away from them.

45. Furthermore, Ms. Khanna also lost her junior project manager who was reassigned outside of FCPMO. Mr. Nolen knew for approximately one month in advance that this junior project manager would be leaving, but he neither informed Ms. Khanna of the date that the junior project manager was leaving nor helped her find a replacement.

46. Rather than support Ms. Khanna to find the needed support, Mr. Nolen either ignored or obstructed Ms. Khanna's attempts to internally hire a new junior project manager.

47. By way of example only, Ms. Khanna interviewed and extended an offer to a project manager who was fluent in Japanese and had experience working in Japan.

48. However, after the offer was made, Ms. Khanna was suddenly told that it had to be retracted because Mr. Nolen did not have the necessary funding.

49. As yet another example, Ms. Khanna interviewed a VP-level project manager, but Mr. Nolen delayed telling Ms. Khanna that he had proceeded to hire this project manager – a White male – who Khanna later learned was designated to report directly to Mr. Nolen.

50. In addition to diminishing Ms. Khanna's responsibilities and direct reports, Mr. Nolen kept Ms. Khanna isolated from the rest of the FCPMO team in the New York office by rejecting her repeated requests to move her office closer to the rest of the team.

**Mr. Nolen Negatively Influences Ms. Khanna's Annual Review**

51. In June 2017, Ms. Khanna received her 2016 Year End Review for the fiscal year ending on March 31, 2017 ("Review").

52. Although Ms. Khanna received a "Fully Meets Expectations" rating for the Review, the rating did not appear to reflect the extremely positive comments about Ms. Khanna's work in the performance evaluation, which included feedback that she:

- "is a dedicated employee with an extremely high work ethic;"
- "is a very strong PM and well-liked by most of her stakeholders and partners;"
- "clearly demonstrated solid EPLC pre-execution phase knowledge through managing the clean slate portfolio;"
- "ensured project status and risk/issues are communicated . . . on a timely basis;" and
- "always diligently track [sic] her project budgets and charge back."

53. After receiving the Review, Ms. Khanna met with Ms. Lin to discuss the disparity between the overwhelmingly positive substantive appraisal and the Review's mediocre rating.

54. Ms. Lin told Ms. Khanna that her performance appraisal was not the only basis for her rating, but that other individuals at the Bank (including Mr. Nolen) influenced the decision to give Ms. Khanna a lower rating.

55. After the meeting with Ms. Lin, Ms. Khanna emailed Mr. Nolen her concerns about the Review.

9

56. Mr. Nolen responded that a "Fully Meets Expectation" rating was not a bad rating and that he would discuss the Review with her when he visited the New York office.

57. Ms. Khanna's meeting with Mr. Nolen about the Review in the New York office evidenced that Mr. Nolen wanted Ms. Khanna to leave the Bank.

58. Specifically, Mr. Nolen told Ms. Khanna that **she should give notice if she planned on leaving the Bank**, and, in a condescending tone, told her that she should say "please" and "thank you" at all times.

59. Mr. Nolen did not raise any performance issues during the meeting and agreed that she was a strong project manager.

60. As a result of this lowered Review rating, Ms. Khanna received only a $60,000 bonus, substantially less than the $100,000 target bonus in her offer letter, and she did not receive a salary increase.

**Ms. Khanna Is Unexpectedly Placed on a Performance Improvement Plan**

61. On August 15, 2017, approximately two months after Ms. Khanna's meeting with Mr. Nolen about the Review and her bonus, Mr. Nolen gave Ms. Khanna a 60-Day Performance Improvement Plan ("PIP").

62. Noticeably, the PIP was dated July 26, 2017, and while Ms. Khanna had multiple one-on-one meetings with Mr. Nolen between July 26, 2017 and August 15, 2017, the issuance of a PIP was never once mentioned.

63. In addition, Ms. Khanna never received an Individual Development Plan – which the Bank's Performance Management Policy directs should be given before issuing a PIP.

64. The PIP blamed Ms. Khanna for issues beyond her control, including the timing and approval of funding requests, and claimed that she was spending too much time on funding requests, even though Mr. Nolen knew that she did not have adequate staff to support her.

65. Meanwhile, Ms. Khanna's male colleagues working under Mr. Nolen had direct reports that managed funding requests for them.

66. In addition, Mr. Nolen held Ms. Khanna accountable for delays in funding requests caused by other departments and refused to allow Ms. Khanna to submit an extension request that would have prevented her project from going on hold.

67. The PIP also claimed that Ms. Khanna needed to improve her understanding of the Bank's Enterprise Project Lifecycle ("EPLC") even though her Review, only two months before, acknowledged that Ms. Khanna "clearly demonstrated solid EPLC pre-execution phase knowledge through managing the clean slate portfolio."

68. On September 25, 2017, Ms. Khanna contacted the Bank's Employee Relations to discuss the Review, and was referred to Sheryl Appelt.

69. Ms. Khanna spoke with Ms. Appelt about her disagreement with the PIP, and told Ms. Appelt that she felt that Mr. Nolen was singling her out in comparison to the other Program Managers reporting to Mr. Nolen (all of whom were White males) and blaming her for issues beyond her control.

70. Ms. Khanna also questioned whether the other Program Managers were being treated the same for delays in their projects.

71. After the conversation, Ms. Khanna provided Ms. Appelt with a list of colleagues to reach out to who would support the quality of Ms. Khanna's work and Mr. Nolen's differential treatment of her.

72. On September 26, 2017, Ms. Khanna met with Mr. Nolen for their weekly one-on-one meeting, and she told him that she had contacted Employee Relations to complain about the Review and his treatment of her.

73. In response, Mr. Nolen lashed out at Ms. Khanna by telling her that she creates unnecessary work and that she was performing at the VP or Associate level – something that Mr. Nolen had never previously claimed.

74. After the meeting, Mr. Nolen updated the PIP with comments, including three different improvement actions.

75. Among them, Mr. Nolen claimed that Ms. Khanna had submitted a funding request with 26 issues, even though Mr. Nolen had told her to submit the request with missing information, and most of the purported issues were either incorrect or had not been flagged as an issue on prior requests.

**Ms. Khanna's Unlawful Termination**

76. On October 13, 2017, Ms. Khanna received a request from Mr. Nolen to move their normal, weekly Tuesday meeting to Monday, October 16, 2017.

77. When Ms. Khanna arrived at the meeting, only a representative from Employee Relations was present in the room while Mr. Nolen was on the telephone.

78. Mr. Nolen started by telling Ms. Khanna that it was the conclusion of the 60-day PIP period, and while admitting he had seen improvement on her part and the funding requests she submitted had been approved, on the whole, he did not think she was capable of performing her job and had "not improved enough."

79. The Employee Relations representative then hung up with Mr. Nolen, gave Ms. Khanna a termination letter and told her to get her belongings from her desk, but not to log in to her computer.

80. The **very next day** after Ms. Khanna's termination, another White male, Michael Best ("Mr. Best"), started working at the Bank in Ms. Khanna's position. With Mr. Best's hiring, Mr. Nolen's Director-level Program Managers were now all White males.

81. The timing of Mr. Best's start date strongly suggests that Mr. Nolen was searching for a replacement for Ms. Khanna after (or even before) issuing Ms. Khanna the PIP on August 15, 2017, and that he intended to terminate her no matter how well she performed.

82. As evidence of this, only two days after being given the PIP, on August 17, 2017, Ms. Khanna received a message from James Martin – a Strategic Sourcing Manager responsible for procuring products and services from vendors – alerting her that she had been "left off on purpose" in an email about vendor pricing that was related to her Vendor Selection Project.

83. The timing of Mr. Nolen's decision to fire Ms. Khanna also suggests that he made the decision after she challenged his discriminatory treatment of her and complained to Employee Relations.

84. Ms. Khanna's purported performance deficiencies are also contradicted with the positive feedback that she received from those she worked with leading up to her termination.

85. For example, on September 12, 2017, Carol Hopkins, Vice President Business Continuity Management, responded to an email by Ms. Khanna about a site location visit saying, "BTW – I think you are doing a wonderful job!"

86. As another example, on October 4, 2017, Thomas Miller, Quality Control for FCPMO Project Management and a direct report of Mr. Nolen, wrote to Ms. Khanna saying, "I

have to say, you are the most organized and prepared PM we have here in this group!" and that he told Mr. Nolen, "if all of his PM's were like [Ms. Khanna], [Mr. Nolen] would be a lucky man but very bored :-)."

87. Also on October 4, 2017, Albert Langlitz, Technology Architect, ended an email chain with Ms. Khanna by saying, "It is always a pleasure to work with you."

88. These positive comments demonstrate that Ms. Khanna did not have performance issues that necessitated her termination, but rather that her termination was motivated by Mr. Nolen's desire to work with only White male Program Managers, and because Ms. Khanna complained about the differential treatment.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Discrimination in Violation of Section 1981)
*Against All Defendants*

89. Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

90. As described above, Defendants have discriminated against Plaintiff on the basis of her race and/or ethnicity in violation of Section 1981 by, *inter alia*, (i) fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a racially hostile work environment; and (ii) terminating Plaintiff.

91. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages.

92. Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Retaliation in Violation of Section 1981)**
*Against All Defendants*

93. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

94. By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of Section 1981 by, *inter alia*, falsely denigrating her work and professional capabilities, and ultimately terminating her employment.

95. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

96. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Discrimination in Violation of NYSHRL (*against all Defendants*) and Title VII (*against Union Bank*))**

97. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

98. Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL and Title VII (as to Union Bank) by treating her differently based upon her gender and denying her the same terms and conditions of employment available to employees who are male, including, but not limited to, subjecting her to disparate treatment and compensation, and ultimately terminating her employment with the Bank. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL

and Title VII (as to Union Bank), Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, for which she is entitled to an award of damages.

99. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL and Title VII (as to Union Bank), Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

100. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL and Title VII (as to Union Bank) for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL (*against all Defendants*) and Title VII (*against Union Bank*))

101. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

102. By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYSHRL and Title VII (as to Union Bank) by, *inter alia*, falsely denigrating her work and professional capabilities, and ultimately terminating her employment.

103. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL and Title VII (as to Union Bank), Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

104. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL and Title VII (as to Union Bank) for which Plaintiff is entitled to an award of punitive damages.

105. To the extent that Defendant Nolen is not individually liable as Plaintiff's employer, Defendant Nolen is liable under the NYSHRL because he aided and abetted the unlawful discriminatory conduct.

## AS AND FOR A FIFTH CAUSE OF ACTION
**(Discrimination in Violation of NYCHRL)**
*Against All Defendants*

106. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

107. Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by treating her differently based upon her gender and denying her the same terms and conditions of employment available to employees who are male, including, but not limited to, subjecting her to disparate treatment and compensation, and ultimately terminating her employment with the Bank. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

108. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

109. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

110. To the extent that Defendant Nolen is not individually liable as Plaintiff's employer, Defendant Nolen is liable under the NYCHRL because he aided and abetted the unlawful discriminatory conduct.

### AS AND FOR A SIXTH CAUSE OF ACTION
### (Retaliation in Violation of NYCHRL)
### *Against All Defendants*

111. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

112. By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by, *inter alia*, falsely denigrating her work and professional capabilities, and ultimately terminating her employment.

113. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

114. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

115. To the extent that Defendant Nolen is not individually liable as Plaintiff's employer, Defendant Nolen is liable under the NYCHRL because he aided and abetted the unlawful discriminatory conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against Defendants for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D. An award of punitive damages in an amount to be determined at trial;

E. Prejudgment interest on all amounts due;

F. An award of Plaintiff's reasonable attorneys' fees and costs; and

G. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 16, 2018
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _/s/ Jeanne Christensen_
Jeanne M. Christensen
Bryan L. Arbeit

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
barbeit@wigdorlaw.com

*Counsel for Plaintiff*